Myron Lewis LOWERY, Jr., Plaintiff,

v.

WMC–TV, Defendant.

No. 81–2775 H.

United States District Court,
W.D. Tennessee, W.D.

April 9, 1987.

Motion to Vacate Granted June 12, 1987.

Donald A. Donati, Deborah P. Ford, Memphis, Tenn., for plaintiff.

John Wilharm, Jr., David G. Holcombe, Cleveland, Ohio, Etrula R. Trotter, Memphis, Tenn., for defendant.

### MEMORANDUM AND ORDER GRANTING JUDGMENT TO PLAINTIFF

HORTON, Chief Judge.

*Dear Myron:*

*There's little I can add to what I've said to you before in personal chats or group meetings. However, let me restate the realities one more time on paper. Maybe I can make them clearer this way.*

*The Future*

*You are ambitious, which is good, and impatient, which is bad.*

*While it might soothe you temporarily if I hinted at the possibility of rapid advancement and big money not far*

*down the road, that would be a crummy thing to do.*

*I like you personally, for whatever that's worth, and admire your energy. But I'm hesitant to speculate on the future until you exhaust the opportunities in your present speciality—until everybody says, "That Myron Lowery is the best damned television reporter in Memphis!"*

Mori Greiner, General Manager
WMC–TV September 26, 1974

*It was never contemplated that Mr. Lowery would be a featured weekday anchor.*

Mori Greiner, General Manager
WMC–TV, Testimony

*I have some very strong impressions based upon a number of occurrences that, like patterns that repeated themselves. I believe that blacks were discriminated against.*

*And I would hear sometimes comments people would sometimes be in awe at the amount of work that Myron would do, how he seemed to get everything done, you know, he didn't sit around and have a cup of coffee or chew the fat, so to speak, for a couple of hours in Frank's office, you know, he came in, and between 'Minority Report' and anchoring the weekend news, which was sometimes referred to as the black news, mostly because of the stories and the anchors.*

Sherry Rosen, Former Employee
News Department, WMC–TV

Myron Lewis Lowery, Jr., a well-known black television personality in Memphis, Tennessee, for more than ten years, filed this lawsuit on September 10, 1981, charging his employer, WMC–TV, racially discriminated against him in the following four ways:

(1) He was denied promotion from weekend to weekday news anchor because of his race, black, while white male employees with less experience and training were given such promotions. Mr. Lowery claims a different and far more stringent standard for promotion was applied to him by WMC–TV than applied to white males who were promoted to news anchor positions. Mr. Lowery claims this application of different standards for promotion by WMC–TV and WMC–TV's failure to promote him was intentional, racially motivated conduct which is prohibited by the civil rights laws of the United States. Mr. Lowery also contends he was denied promotion to other positions at WMC–TV for racially biased reasons.

(2) WMC–TV racially discriminated against him in the terms and conditions of his employment in that similarly situated white male employees who were promoted to weekday and weeknight news anchor positions were given the benefit of a written contract of employment and higher pay while he, as weekend news anchor performing substantially the same work, was denied a written employment contract and was paid less money on a salary scale as reporter correspondent.

(3) Although he performed substantially the same work as white news anchor employees who worked under written employment contracts as weekday and weeknight news anchors, WMC–TV paid him less money for his services and Mr. Lowery claims this differential in pay was intentional and racially motivated conduct which was discriminatory toward him.

(4) When he exercised his legal right to file this racial discrimination lawsuit against WMC–TV, the management of that television station retaliated against him by taking him off the air. Mr. Lowery filed an amendment to his original complaint on September 23, 1981, asserting the retaliation charge after having obtained a right to sue letter from the Equal Employment Opportunity Commission.

WMC–TV strongly denied that it racially discriminated against Mr. Lowery in any way or manner whatever. WMC–TV claims Mr. Lowery's growth, development and performance peaked at a point in his career with the television station and he failed to measure up to standards the sta-

tion expected and demanded of its weekday and weeknight news anchors.

After hearing extensive evidence presented during a nine-day trial, reading the entire trial transcript, pre-trial and post-trial briefs, and upon the entire record, the Court finds from all of the evidence:

(1) WMC–TV denied Myron Lowery promotion from weekend to weekday or weeknight news anchor positions because of his race. The Court finds Myron Lowery has shown, by a preponderance of the evidence that WMC–TV racially discriminated against him by its imposition upon him of an impossible and different standard for promotion than it imposed upon white male television reporters. In the case of Mr. Lowery, the standard imposed was:

> "... *until everybody says that Myron Lowery is the best damned television reporter in Memphis.*"

The standard imposed upon white male television reporters was that of *potential* to break loose and be splendid. The Court also finds from the preponderance of the evidence that WMC–TV denied Mr. Lowery promotions to other positions in the News Department and at the station because of his race.

(2) WMC–TV racially discriminated against Myron Lowery in the terms and conditions of his employment by denying him a written contract of employment while white male employees performing as news anchors were given written contracts.

(3) WMC–TV racially discriminated against Myron Lowery by paying him less money than similarly situated white male employees although he was performing substantially the same work.

(4) WMC–TV retaliated against Myron Lowery for exercising his federal legal right to file this racial discrimination lawsuit by taking him off the air from September 15, 1981, to October 13, 1981.

(5) The racial discrimination against Myron Lowery by WMC–TV was pervasive, continuing, invidious and on-going discrimination.

Considering the trial record as a whole and focusing the entire case down to its core, the preponderance of the evidence shows the management of WMC–TV fenced Myron Lowery into a no-win situation. ⁾ First, in order for his future to be considered, management staked out an impossible standard for him to meet. He had to excel to the point where everybody would say that Myron Lowery was the best damned television reporter in Memphis. Similarly situated white employees only had to demonstrate potential to excel, to break loose and become splendid. Second, even if by some miracle Mr. Lowery had achieved this mission impossible standard, he would have failed nevertheless. Substantial proof in the record shows the management of WMC–TV never even considered Myron Lowery for a featured weekday or weeknight anchor position even though he had been a weekend news anchor for ten (10) years and had made more than twelve hundred (1200) television broadcasts. This trial record demonstrates a worst-case scenario of sophisticated and subtle racism in private sector employment. Schemes of discrimination, whether blatant or subtle, are forbidden. *Long v. Ford Motor Company,* 496 F.2d 500, 505 (6th Cir.1974).

In the remedy section of this opinion and order, the Court will award Myron Lowery appropriate relief.

*Background Facts*

An extensive factual background exists in this case. Plaintiff's claims require detailed discussion of particular facts in order to show the environment at WMC–TV as evidenced by the treatment of Mr. Lowery and other blacks by the management and supervisory personnel of WMC–TV. Certain issue-specific facts are reserved for later discussion of those issues.

Myron Lowery, a black male, who earned an undergraduate degree in sociology and a master's degree in education, was employed by WMC–TV on June 21, 1971. He resigned August 4, 1983. Initially, he was recruited by WMC–TV as a student-trainee for participation in a specially designed summer journalism program for minorities

conducted at the Columbia University School of Journalism and funded by various foundations.

Upon completion of an eleven-week training program, Mr. Lowery returned to Memphis as WMC–TV's first full-time black reporter. After beginning as a general assignment reporter, Mr. Lowery was promoted in 1973 to co-anchor weekend newscasts, at first only Sunday newscasts. He continued as a weekend anchor with four thirty-minute newscasts until April of 1980, when he was reduced to two thirty-minute programs per weekend. Mr. Lowery also continued as a reporter, covering and editing his own stories, producing weekend newscasts, and developed and produced numerous documentaries. From time to time, he anchored weekday newscasts. In 1976, he became host of "Minority Report," the station's monthly public affairs program. As such, he served as the reporter, writer, producer, and often editor, of "Minority Report." He continued in this role, as well, until his resignation.

Mr. Lowery's work did not go unnoticed in the television industry. In 1974, he discovered the impending closing of the Mound Bayou Hospital in Mound Bayou, Mississippi. The small Mississippi town lacked federal funds to maintain its only hospital, serving predominantly black patients. In response to the community's crisis, Mr. Lowery with the station's support researched, wrote and produced a full-length documentary, "Trouble in Mound Bayou." He provided its on-air talent and assisted in editing the film. WMC–TV received for this documentary the prestigious Alfred I. DuPont-Columbia University Awards Citation for Distinction in Broadcast Journalism. Mori Greiner, WMC–TV Station Manager, distributed to the entire staff the following congratulatory comments: "Congratulations to Myron Lowery, who discovered 'Trouble in Mound Bayou', (sic) then wrote and produced a program about it." Mr. Lowery requested permission from station management to accept the citation at the awards ceremony and a duplicate citation. Mr. Greiner replied: "Mr. Lowery discovered the problem which the program addressed, convinced

management of its importance, and carried out the resulting assignment in a tenacious, enterprising and professional fashion. It would be entirely appropriate for him as well as the station to receive recognition."

Meanwhile, Mr. Lowery's stature as a leader in the community grew: The Tennessee Jaycees selected him for recognition and award as one of three outstanding young men in the state in 1981; the National Jaycees award followed in 1983 for recognition as one of Ten Outstanding Young Men in America.

In April 1980, Mr. Lowery was replaced on the Sunday news by Brenda Wood, a black female, hired from a Huntsville, Alabama station to co-anchor weekday evening news with Joe Birch. WMC–TV claims Ms. Wood was assigned the Sunday news anchor slot rather than the usual Friday evening spot in order to accommodate her religious beliefs. The same month, plaintiff filed his charge with EEOC, followed by this suit on September 10, 1981. Five days later he was removed from all on-air activity. He did not return until October 13, 1981. Due to vacation, regular time off and pre-approved absences from the station, plaintiff's actual time off the air was reduced to nine-and-a-half days, when his work consisted of "routine" assignments in the newsroom.

Mr. Lowery resigned August 4, 1983, to run for a seat on the Memphis City Council. At the time of his resignation, he remained a "reporter correspondent" and weekend anchor.

*Promotion Claim*

Myron Lowery claims that although he possessed the necessary qualifications and job experience he was denied, because of his race, the opportunity for promotion, by the management of WMC–TV, from weekend news anchor to weekday or weeknight news anchor. Mr. Lowery testified he was qualified for the job. He was already performing in the weekend news anchor position for the television station. He had high viewer recognizability as determined by a professional rating organization employed

by WMC–TV. Yet, he claims, when the weekday and weeknight news anchor positions were filled he was passed over and preference was given to white males who were much less qualified, less experienced and who had lower viewer recognizability ratings.

Mr. Lowery testified he was employed by WMC–TV in September, 1971. He was the first full-time black general assignment reporter employed by the station. His duties increased in 1973 when he became anchor person for the station's weekend news. In March, 1976, he was given the opportunity to produce a monthly public affairs program called "Minority Report." He said he produced this program until he left the station in August of 1983. He testified the "Minority Report" program was well-received and won several national awards, including honorable mention in the Ohio State Awards, and a third place category in the New York Film Festival. One program in the series, entitled "Trouble in Mound Bayou," received a citation for distinction in broadcast journalism from the Alfred I. DuPont Columbia University Awards Committee. That program dealt with the financial difficulties faced by a small predominately black hospital in Mound Bayou, Mississippi, serving indigent patients who were not receiving treatment at other white hospitals in the area. On January 20, 1975, Mori Greiner, General Manager of WMC–TV congratulated Lowery for discovering the trouble at the Mound Bayou hospital. Mr. Greiner also congratulated others who helped on the project and recognized that Lowery wrote the script and produced the program. In addition to being honored as one of the National Jaycee's Ten Outstanding Young Men in America in 1983, Mr. Lowery taught broadcast journalism at Memphis State University, Memphis, Tennessee, Howard University, Washington, D.C., and LeMoyne-Owen College, Memphis, Tennessee. He testified that several of his students went on to careers in broadcast journalism.

In order to demonstrate disparate treatment, based upon his race, which he claims he suffered at WMC–TV, Mr. Lowery testified that three white males with less job qualifications than he had were given preference over him for promotion to weekday and weeknight news anchor positions. They were Roger Cooper, Mason Granger and Joe Birch.

Mr. Lowery testified that Roger Cooper joined the station several years after he had been employed there. He said Roger Cooper was promoted to five o'clock weeknight news anchor in December, 1977, and received a contract and a higher salary. Lowery said Cooper had a limited amount of television news experience as Cooper's experience was in radio. He said Cooper had no experience as a television news anchor and much less experience than he had in broadcast journalism. Mr. Lowery said Magid Consultants, employed by WMC–TV to conduct a community survey, reported Mr. Cooper placed very low on his recognizability factor and this survey was conducted before Cooper was promoted to weeknight news anchor. Mr. Cooper was apparently not successful in this position and was removed by station management. Mr. Greiner, General Manager of WMC–TV testified:

Q. Problems with Mr. Cooper persisted up through January of 1980?

A. Yes, sir.

Q. In January 1980 did you enter into a new contract with Mr. Cooper? Did you enter into a new contract with Mr. Cooper?

A. Yes, sir.

Q. Is it fair to say at that time, at the time of entry of this contract that you considered Mr. Cooper's performance to be below the level that you wanted it to be?

A. Yes, sir, in the case of Mr. Cooper it was a disappointment, we had the feel constantly that he was going to break loose and be splendid, it just didn't happen in the course of his employment with us. We still nurtured this hope at this time.

Q. You entered into a new contract with him January the 18th, 1980?

A. Yes, sir.

Q. And three months later you took him off the air as a weekend, not off the air, but you removed him from the weekend or the weekday anchor position?

A. The weekday anchor position, that is correct.

It is Mr. Lowery's position that he was better qualified than Mr. Cooper for the news anchor position. Yet, Mr. Cooper received preference over him and this, Mr. Lowery claims, was a racially biased and racially motivated management decision. Lowery testified that when Cooper was promoted he had been anchoring the weekend news show at WMC–TV since 1973 and had four years news anchor work with the television station.

Mr. Lowery testified a white male, Mason Granger, joined the station in 1975. When Mr. Granger first joined the station, he did not perform as a reporter. He was assigned to production aspects of the news such as operating a Teleprompter. He was promoted to reporter. In 1977, after he had been with the station two years, Mr. Granger was promoted to weeknight anchor. Mr. Lowery said when the news anchor positions were filled, there was no posting of any vacancy notice. He said it was just announced one day that Roger Cooper would co-anchor the five o'clock news and Mason Granger would be the anchor on the ten o'clock news. Mr. Lowery testified that at the time when Mr. Granger was promoted to news anchor the Magid Consultants survey showed that Granger had a very low recognizability factor while his, Lowery's, recognizability factor was extremely high. Comparing himself with Mr. Granger, Mr. Lowery said that at the time he had more broadcast journalism experience, a high recognizability factor and high ratings from both Neilson and Arbitron. He said his work was good yet he was denied the opportunity for promotion. This denial, Mr. Lowery claims, was racially motivated.

Subsequently, Mr. Lowery testified Mr. Granger was promoted to Assistant News Director for the station, a position that had not been filled in several years. Later, he said Mr. Granger was promoted to the posi-

tion of News Director for WMC–TV. When Mr. Granger was promoted to News Director, Mr. Lowery testified he formally applied for the position of Assistant News Director, the position from which Mr. Granger had been promoted. He said he also discussed the possibility of his promotion with Mr. Granger. He said Mr. Granger responded to his inquiries by saying:

Well, Myron, that is a luxury I don't think we can afford to keep right now.

Mr. Lowery testified a third white male, Joe Birch, joined the station in 1982 as an intern. He said Mr. Birch started working on weekends as a "grip," carrying equipment. He was, however, given an opportunity to progress by being given additional assignments. He said Mr. Birch eventually started writing. He started working as a reporter and was allowed to substitute as anchor during weekdays and eventually was promoted to weekday anchor. At that point, Mr. Lowery testified he had nine years experience as a weekend news anchor, nine years experience as a reporter and six years experience as producer of "Minority Report." He said, at the time, Mr. Birch, to his knowledge, did not have any anchoring experience and no ratings to pull from. He testified that when Roger Cooper, Mason Granger and Joe Birch were promoted to anchor positions they did not have a track record with WMC–TV. He did have a work track record.

Mr. Lowery testified he was looking for avenues for professional growth and advancement. He said he sought other positions with the television station. He inquired about positions as Special Projects Director, Urban Affairs Director, Executive Director, Assistant News Director and a possible position in sales. He was not successful in obtaining any of those positions:

Q. Mr. Lowery, did you ever have any conversations during the course of your employment with Mr. Greaney about promotions?

A. Yes, I did.

Q. How often?

A. I would say about two or three times a year I would talk to Mr. Greaney about promotions.

Q. What were the natures of the conversation, how did they, generally what did they involve?

A. His reply was the same that Mr. Greiner replied to me, and that was we're satisfied with what you are doing, you are doing a good job, let's, let's fully utilize you in this area, and let's see what might come along.

Q. At any time during these discussions did Mr. Greaney or Mr. Greiner complain about your competency as a weekend anchor?

A. They never did. In fact, I was complimented. You look at an anchor, you also judge an anchor by rating. At one point I had a rating of higher than a 50 percent share, and that is something that was unheard of, there wasn't any network bringing in 50 percent share of local newscasts, and they were quite satisfied with that.

Q. When you asked about advancement, promotions, did Mr. Greaney and Mr. Greiner, what was their response typically?

A. Their response was they were pleased with what I was doing and the role that I was doing, and I had to continue to do that. If you recall earlier in the trial, Mr. Greiner wrote me a memo and he said until everyone says that Myron Lowery is the best damned reporter in town, until you have exhausted everything in your present speciality, then we will talk about your promotion. I was constantly put over by saying you are doing fine, let's wait a while, we are pleased with the role that you are doing.

Q. Did you ever specifically ask for promotions into other areas?

A. Yes, I did.

Q. To Mr. Greaney and to Mr. Greiner?

A. Yes, I did.

Q. What areas specifically?

A. I asked for promotions within and outside the news department. Specifically outside the news department, I discussed the opportunity in sales.

Q. When did you first discuss that?

A. It was during the seventies.

Q. All right. Any other specific discussions about jobs to be promoted to, you said inside and outside the newsroom?

A. Outside, we mentioned sales during the seventies. At that time the station did not have any black sales people at all, they eventually hired one, one black male. They eventually hired another black female. During the time that I was asking for that promotion, there weren't any blacks in the sale department.

Q. What was the response concerning sales?

A. They were pleased with what I was achieving and doing within the news department as a reporter. They were pleased with the weekend anchoring. They were pleased with "Minority Report".

Q. Any other jobs that you specifically requested transfer or promotion to?

A. I asked Mori Greiner on several occasions as well as Ed Greaney what I needed to do for professional growth and advancement, what was it necessary for me to do, and I was told to continue to do what you are doing. I asked specifically about special projects. The position that Frank Gardner had in terms of producing documentaries. I had experience in this area, I had produced a documentary on Martin Luther King, I produced a documentary on the Mound Bayou, two documentaries in Guatemala, I had a good track record, those were good productions.

Q. What was Mr. Greiner's response when you requested that?

A. He agreed they were good. Eventually I was given the opportunity to do "Minority Report" based on the track record for producing those other documentaries, and my duties were expanded to produce "Minority Report", that was one response as opposed to being given the job of special projects, which would have been on a full time basis at a higher salary.

Q. Any other jobs that you specifically-talked to or advancement with Mr. Greiner or Mr. Greaney?

A. Again the general overall conversation dealt with advancement within the news department, and whatever it took for that. They were filling the position of executive producer. I asked for any position within the news department, and that was one of the positions that was open during several periods of time. Also the position of assistant news director. Now, you specified Mr. Greiner and Mr. Greaney. I talked specifically with Mason Granger about that particular position.

Q. There's been discussion about, throughout the course of this trial about subjective criteria for a weekday anchor, a discussion about diction and pronunciation and those matters. Are you aware of any nationally recognized news personalities or talent that have distinctive pronunciation or problems in those areas?

A. People in the business refer to problems that Barbara Walters has at times, as well as Tom Brokaw, they call Barbara Walters, Barbara Wau-Wau because of what she does with her R's, and so far that happens to people, they are still accepted and they progressed.

Q. Mr. Lowery, do you believe you have any problem with your diction, speech, enunciation or pronunciation?

A. Not any type of problems that would have prevented me from the weekday anchor. I was good enough for ten years as the weekend anchor and never given the opportunity to be the weekday anchor, and from what they have said in this court about they were giving me the opportunity to grow, how much time do you need. I should have been given that opportunity. I felt I was bringing in high ratings on the weekend, I had high recognizability, I was doing the job for them in one area, I was good enough for one part but not for the other area.

During his tenure with the television station, Mr. Lowery testified he did not know of any black reporter who received a promotion. He said there were black employees who sought promotion and either left the station or were terminated:

(1) *Phyllis Armstrong*, a black female reporter, sought advancement and later left the station. At the time of trial, he said she was employed as a morning news anchor in Washington, D.C.

(2) *George Bryant*, a black male, sought promotion and subsequently left the station for a reporter/weekend anchor position in Atlanta, Georgia.

(3) *Sylvia Black*, a black female, sought promotion. She was terminated and later found employment in Pittsburgh, Pennsylvania, and Houston, Texas.

(4) *Hank Lockhart*, a black male reporter, sought promotion but was eventually terminated.

(5) *Carolyn Brookter*, a black female, sought promotion and subsequently left the station for employment in Minneapolis, Minnesota.

(6) *Cynthia Williams*, a black female reporter, sought promotion and was subsequently terminated.

Lowery claims, however, that white reporters were promoted during the years of his tenure at WMC–TV. He mentions again Roger Cooper, Mason Granger and Joe Birch. He said Gaylon Reasons, a white male, was promoted from Film Editor to Executive Producer. Ron Michaels, white male radio reporter, was promoted to Assignments Editor within the News Department.

*Sherry Rosen*, a white female, testified she started at WMC–TV as an unpaid intern and was subsequently hired by the station as a Researcher in the News Department. She was employed there from late summer of 1977 to the summer of 1978. She testified that black reporters were treated differently from white reporters. She said she had very strong impressions based upon a number of occurrences like patterns that repeated themselves.

Ms. Rosen testified she believed blacks were discriminated against. She overheard conversations in the newsroom between Mr. Gardner, Mr. Reasons, Mr. Michaels and Mr. Zarchin. She testified a lot of comments were made about Sylvia Black, a black female reporter. These men did not feel her appearance or the sound of her voice was what they wanted on the TV

cameras. It was a joke in the newsroom to give Ms. Black the "garbage stories." She said on one occasion, when stories developed about the North Memphis Waste Treatment Plant, the joke was we have a story for Sylvia today. She said the big stories, particularly some she researched, were never given to black reporters. Stories assigned to black reporters were lower down on the priority list when it came to assignment of camera crews. For example, she said a camera crew may shoot a number of stories and then black reporters would do a voice-over. This meant black reporters would write a voice piece to go with whatever the cameramen had shot. She said there was much less patience with black reporters when they made mistakes. She said the biggest stories, the big productions, the stories she researched were given to Mason Granger and some of them to Roger Cooper, but most of them to Mason Granger. She testified she was asked by Myron Lowery to help him with two stories, one on bankruptcy and the other dealing with bingo. She was never assigned by management to assist Myron Lowery. She said that she, along with Mr. Gardner, helped Mason Granger with writing but not Myron Lowery. She said white reporters working on stories met with news department management to discuss stories, but she could not recall seeing that being done with a black reporter. She said the weekend news was sometimes referred to as the black news, mostly because of the stories and the anchors. She said comments about blacks were degrading, such as, "we hope we can get one who looks good on camera and can speak English."

On cross-examination, Ms. Rosen said Eileen Jones, a black female reporter, received assistance and patience in the newsroom. At times, she heard white reporters also complain about assignments and about camera assignments.

*Henry Frank Lockhart, Jr.,* testified he was a general assignment reporter for WMC–TV from 1974 to 1978. He said he complained to the management at WMC–TV because he was given stories that had no substance. Before being employed at WMC–TV, Mr. Lockhart had worked two years in a Memphis bank and at WREC–TV in Memphis from 1966 until 1972. He decided he wanted out of the news department at WMC–TV and approached Mr. Greiner about a vacancy in Promotions, Director of Promotions. He said Mr. Greiner told him it would not be the kind of money he was getting in the news department and he should forget it.

Mr. Lockhart testified that, in retrospect, he was treated differently in assignments and he believed it to be racial. He said it was racial, I think. He believes his treatment at WMC–TV was racial and believes that today.

*Paul F. Gardner* testified he was employed by WMC–TV as Director of Special Projects in February of 1976. In May of 1977, he became News Director and remained in that job about four years. As News Director from 1977 to 1981, he supervised Myron Lowery. In the summer or fall of 1977, Mr. Gardner said WMC–TV was considering a change in its weekday anchors. When asked to explain how the station went about its selection process, Mr. Gardner said the management of the station went through a summer of deliberations on what to do. He said the station tried a number of people for anchor roles during the July to December, 1977 period. He testified "we" tried a number of people, including Myron Lowery, Eileen Jones, Peggy Rolfes, Mason Granger and Roger Cooper on a sort of rotating basis to give "us" an opportunity to look at relative strengths and weaknesses of anchors before we made a final decision and settled on a permanent team. He testified Myron Lowery was a serious candidate for a weekday news anchor position.

This testimony by Mr. Gardner directly contradicted the testimony of Mr. Greiner when he testified as a witness called by Mr. Lowery. During the course of that testimony, Mr. Greiner testified it was never contemplated that Mr. Lowery would be a featured weekday anchor. Mr. Greiner also testified the duties of Mr. Lowery and Mr. Cooper were the same:

Q. Is it fair to say that under the terms of the duties of Mr. Roger Cooper, Mr. Myron Lowery had the same types of duties at the time of this contract?

A. No, sir, I wouldn't say that was fair. It was never contemplated that Mr. Lowery would be a featured weekday anchor. And that was the purpose, the primary purpose of granting this contract.

Q. Let me ask you the question another way, is there anyone of the duties in here that says that Mr. Cooper will have, under the terms of this contract, any of those duties that Mr. Lowery didn't have?

A. I believe, I can't remember if the correct answer to that should be yes or no, so let me restate it. I don't believe there is anything in here that would not also be required of Mr. Lowery under the verbal terms of his employment.

Mr. Gardner testified the final decision on news anchors was made in December, 1977. The five o'clock team was Dick Hawley and Roger Cooper. Mason Granger was the ten o'clock anchor. He said these decisions were made in consultation with Mori Greiner and Ed Greaney.

Mr. Gardner said Roger Cooper was selected because he was an accomplished reporter, the best feature reporter that had ever worked in local television. He had distinguished himself. His voice was excellent. He was a good reader and deliverer of the news.

Mr. Gardner testified Mason Granger was the best hard news reporter on the staff. He wanted anchors to be working hard news reporters and Granger filled that bill. He was a good reader, communicated with the viewer and the camera comfortably, informally and confidently. His skills were excellent.

Gardner testified Myron Lowery was considered but not selected. He said Myron Lowery did not have a commanding presence. He had problems with enunciation, pronunciation, diction and attention to detail. He could not project enough credibility or believability with the viewer. He did not adequately project the desired quality of confidence. He said length of service was not a determinant in selecting a news anchor. High ratings on weekends had no connection with the advisability of taking a weekend anchor and making him a weekday anchor.

He testified that in April of 1980, he informed Roger Cooper he was being taken off the five o'clock broadcast because his anchoring had not worked out successfully.

He testified that in April, 1980, he told Myron Lowery his strength was not in anchoring and he should not attach his hope in the future to anchoring. He said he had a lot of respect for Lowery's reporting ability as Lowery had distinguished himself as a fine reporter. However, he did not see Lowery as being a successful news anchor.

Gardner denied black reporters were given less desirable assignments or less help than white reporters. He testified he never considered Lowery for any other news department jobs.

Mr. Gardner testified that when Mason Granger and Roger Cooper came off the air after a broadcast, they engaged in post-broadcast critiques every night over a period of about two years. He said his conducting such post-broadcast critiques with them was routine. These daily critiques were not memorialized by written memoranda and placed in the files of either Granger or Cooper as was done in the case of Myron Lowery. He said post broadcast critiques were was not followed with Myron Lowery, however. The memos concerning Lowery were to jog his memory since Myron Lowery was a weekend anchor and he often viewed Lowery's broadcasts from his home.

*Gwen Sneed,* a teacher in the Memphis City Schools, testified she holds a master's degree in mass communications from Memphis State University. She is also treasurer of the National Black Media Coalition and Executive Director of Operation PUSH in Memphis.

Representing Operation PUSH, Ms. Sneed testified she discussed the organization's concerns about the lack of black people in the station's management:

Q. What was the station's response to your concern that there weren't people in the top part of the station management?

A. Well, generally the answer was that, you know, it takes a while to make it to management, and blacks just started working in the industry, and it's going to take a while to develop and let them grow into these areas.

Q. Are you aware of other stations in the geographic area of Memphis that their 395's, their efforts to recruit, have you had occasion to look at other stations?

A. Yes, in Memphis, Tennessee, WHSQ television has blacks in nontraditional roles in their news department, for the last five years or so they have had black news assignment editors, and they recruited these guys locally, you know, it didn't take a whole big process to get them.

*Title VII and 42 U.S.C. § 1981 Claim*

■■■ These general principles provide the legal foundation in this case: Title VII and 42 U.S.C. § 1981 are coextensive and coterminus federal statutes and afford federal remedy to aggrieved litigants who have been racially discriminated against in employment. *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 459–460, 95 S.Ct. 1716, 1719–1720, 44 L.Ed.2d 295 (1975). *Nichelson v. Quaker Oats Co.,* 573 F.Supp. 1209, 1219 (W.D.Tenn.1983), *rev'd* on other grounds, 752 F.2d 1153 (6th Cir. 1985), *vacated,* 472 U.S. 1004, 105 S.Ct. 2696, 86 L.Ed.2d 713 (1985). While the burden of going forward may shift between the plaintiff and defendant in such actions, the burden of persuasion always remains on the plaintiff who must prove that it is more probable than not that he was the target of unlawful discrimination. *Jackson v. RKO Bottlers of Toledo, Inc.,* 743 F.2d 370, 374–375 (6th Cir.1984); *Nichelson v. Quaker Oats Co.,* 573 F.Supp. at 1227.

Principles governing the evidentiary burdens in Title VII apply equally to actions under 42 U.S.C. § 1981. *Long v. Ford Motor Co.,* 496 F.2d 500 (6th Cir.1974).

■■ Any analysis of discrimination in promotion claims must be structured to accommodate the evidentiary burden, or the allocation of the proof, established by *McDonnell Douglas* and *Burdine. McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1981); *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Simply put, the plaintiff must initially show a prima facie case of discrimination: facts which by a preponderance of the evidence, if unexplained, prove or give rise to an inference of unlawful discrimination. Once the plaintiff meets this threshold requirement, the defendant must go forward with evidence articulating a legitimate nondiscriminatory reason for its actions. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093.

If defendant proffers evidence sufficient to raise a genuine issue of fact whether it discriminated against the plaintiff, it carries the burden of production, thereby raising a presumption the prima facie case is rebutted. *Burdine,* 450 U.S. at 255–256, 101 S.Ct. at 1094–1095. At this point, the plaintiff has the opportunity to show the proffered reason was not the true reason for the employment decision, or was, in other words, pretext. *Id.* This burden and the ultimate burden of proving intentional discrimination merge and plaintiff may then persuade the Court directly, i.e., a discriminatory reason more likely motivated employer, or indirectly, i.e., the proffered reason is unworthy of credence *Id.* at 450 U.S. 256, 101 S.Ct. 1095.

The effect of this Title VII burden shifting is critical, because once the plaintiff establishes a prima facie case, the Court "presumes that the employer's acts, 'if otherwise unexplained, are more likely than not, based on the consideration of impermissible factors.'" *Jackson v. RKO Bottlers,* 743 F.2d at 375 (*quoting Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978)).

Inasmuch as demonstration of a prima facie case is crucial, it deserves thorough consideration. *McDonnell Douglas* and *Burdine* establish four elements to show a prima facie case of disparate treatment because of race under Title VII in the context of a promotion claim: 1) plaintiff belongs to a racial minority, 2) and applied for an available position for which he or she was qualified, 3) was rejected, and 4) following the rejection, the employer continued recruiting applicants with qualifications comparable to plaintiff's. *Jackson v. RKO Bottlers*, 743 F.2d at 375 (citing, *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095; *Draper v. Smith Tool and Engineering Co.*, 728 F.2d 256 (6th Cir.1984)). Stated another way, under the *McDonnell Douglas* test, Mr. Lowery may establish a prima facie case by showing 1) that he was a member of a racial minority, 2) that he and a similarly placed white person received dissimilar treatment, and 3) that sufficient evidence exists from which the Court can find a causal connection between race and the alleged acts of WMC–TV. *Nichelson v. Quaker Oats Co.*, 573 F.Supp. at 1219.

Thus, to prevail, Mr. Lowery must show by a preponderance of the evidence that race was a factor in WMC–TV's failure to promote him. He must show a purposeful discrimination in management's promotion decisions by a preponderance of the evidence. *Burdine, supra.*

The alleged discriminatory conduct and subsequent retaliatory actions against Myron Lowery began in 1974 and continued until the plaintiff left WMC–TV in 1983. WMC–TV did not post vacancies in managerial or anchor positions. Instead employees generally learned of these positions only after they were filled. In some cases, positions were created for certain individuals and left vacant after the original "talent" left the station or moved into another post at the station. There were no formal or written procedures for application, nor were requirements posted for open positions.

Plaintiff alleges he was denied the opportunity to seek promotion to several management positions.

The thrust of Mr. Lowery's complaint and most of his proof focuses on the weekday and weeknight anchor positions and the promotions of three white male reporters to those anchor positions.

Personal attributes necessary for the weekday and weeknight anchor person, according to defendant and plaintiff included projection of a sense of authority, credibility, warmth, a conversational delivery, pleasing appearance and voice. Also critical, the feature weekday anchor must be a good writer and reporter of news, and have solid educational credentials. The anchor must possess good grammar and enunciation, must generally be a good speaker with recognizability in the viewing audience.

WMC–TV conceded that measurement of the desired qualities in a particular candidate was entirely subjective. They conceded that the station used only subjective criteria for evaluating continuing performance of on-air talent, but contended this was an industry-wide practice and objective tests were impossible. The Court notes that, while subjective criteria may be a valid factor in employment decisions, reliance on subjective criteria will be carefully scrutinized to present abuse. *Nichelson v. Quaker Oats*, 573 F.Supp. at 1226–1227 (citations omitted).

In 1977, WMC–TV changed its weekday news anchor team. These changes were made primarily at the direction of the station's news director, Frank Gardner, who was responsible for the daily news broadcasts and for all news department personnel. When Mr. Gardner assumed this position in May of 1977, the station's news team was second in the "ratings battle." During the summer and fall of 1977, in an effort to improve its ratings, defendant terminated one of the co-anchors and then allegedly rotated five of its newscasters in the weekday anchor chair. The rotation process, defendant contends, allowed WMC–TV to judge the relative strengths and weaknesses of each candidate. Among

these five were Mr. Lowery and a black female, Eileen Jones, Peggy Rolfes, Mason Granger and Roger Cooper. Defendant states all candidates received "reasonably equal" airtime exposure with the exception of Eileen Jones, who was hired one month into the rotation process.

Mr. Lowery at this time had been serving since 1973 as weekend anchor, while continuing duties as a reporter as well. Additionally, he had almost complete responsibility for the monthly "Minority Report." He had been engaged in working on documentaries, including the aforementioned award-winning Mound Bayou project.

Gardner, supported by Mori Greiner and Mr. Greaney, selected Roger Cooper to co-anchor the early broadcast and Mason Granger to anchor the late evening broadcast. These three testified as to their reasons for selecting these two, both reporters:

*Roger Cooper:* Mr. Gardner considered Mr. Cooper "the best feature reporter" to have worked in the Memphis market, believed he had "an excellent voice," was a good "deliverer" of news. Mr. Greiner's opinion was similar: Cooper was a good writer, spoke well, had a nice appearance and "measured up well" in the attributes of reliability, accuracy, believability, appearance, poise, delivery, humor and friendliness. Mr. Greiner felt Mr. Cooper had an ability to project sincerity and warmth, and a good voice, was good at relating the news, was memorable, and spoke with authority.

*Mason Granger:* Mr. Gardner believed Mr. Granger was the "best hard-news reporter" on the staff, that he was a good reader, one who communicated with viewers "comfortably and informally and confidently." In Greiner's estimation Mr. Granger was a "top-notch" reporter "who expressed himself clearly, had a good delivery. He was impressed with Mr. Granger's education. He believed Mr. Granger demonstrated understandability, had a good appearance, and poise, as well as intelligence, humor and accuracy in his work. Mr. Greaney concurred with the others, adding that Mr. Granger had a "good clean clear

voice," was memorable and exhibited authority.

Mr. Greaney and Mr. Gardner considered Mr. Lowery a "serious candidate" for the anchor position but found Mr. Cooper and Mr. Granger both qualified, even though neither had anchor experience, and preferable to Mr. Lowery because he was lacking in these attributes. Specifically, Mr. Gardner felt Mr. Lowery did not have the commanding presence of Mr. Cooper and Mr. Granger, nor did he project the desired confidence. He was not as understandable as the other two. Mr. Greiner rejected Mr. Lowery because he had not overcome his "propensity to make mistakes," and his problems with enunciation, pronunciation and nasality. Mr. Greaney testified that Mr. Lowery's voice did not measure up, he hesitated in his presentation, "read" the news and delivered without "any sense of change from story to story or item to item."

It is at this point that an understanding of the Magid reports would be helpful. In an effort to increase the quality of WMC–TV's news casts, the station employed a consulting firm, Frank N. Magid Associates, to research the local television news market and television news personalities. These studies continued, concurrent with changes initiated in the news programming at the station, throughout Mr. Lowery's employment at the station. Research results, i.e., Magid reports, were released to the station's management periodically. Evaluations, based on various methods of information gathering, and specific suggestions for development of the news department were generally a focal part of the Magid reports.

As might be expected, the parties have used these Magid reports in a way most favorable to their positions in this suit. The reports are helpful to the Court, because they offer some objective comment, but more significant to this case is the manner in which they were, or were not used, in the promotion process.

WMC–TV used these reports to corroborate its negative criticism of Mr. Lowery's performance. In some respects the reports

do just that. However, these same reports were virtually ignored to the extent that they may have offered negative criticism on the Cooper-Granger promotions. For instance, on December 27, 1976, Magid reported the following assessment of Cooper's performance: his pace was too slow with little life or vitality; his presentation unclear, he used improper emphasis; he did not pronounce properly key words and phrases. The report continued: variation in delivery was lacking resulting in "monotony." Finally, Mr. Cooper's voice inflection was rather limited and he was "physically stiff on the air." Prior to the promotion, Magid also reported that Mr. Cooper had a very low recognizability factor, whereas they indicated Lowery's was high.

During his testimony, Mr. Greiner answered questions concerning Mason Granger's rapid promotions at WMC–TV and an August 1977 report on the station and personalities, which made the following assessment of Mason Granger's impact on viewers:

Q. Can you name a person in the history of the station that advanced and promoted within the ranks of the station faster than Mr. Granger?

A. No one comes to mind immediately, no, sir.

Q. All right. Let me ask you to look at, back to your reports of the Magid group. Let me ask you to look at page 298 of the Magid report. Did they give you an analysis of Mason Granger's impact on the audience in August of 1977 when this report was done?

A. Yes.

Q. Will you read that, sir?

A. "For being in the marketplace two years, Mason Granger has made a very limited impact to date. Just 22 percent of the area news viewers are familiar with Granger, and of these individuals, only 6 percent would rate him excellent in his role. This places him well down the list in this test."

Q. Go ahead.

A. "The substantive viewer reactions to Mason Granger are few and far between. Those who are familiar with him often say that he does only a fair or "all right" job and only know that he is the station's roving field reporter who is 'sent out of town a lot.' As to his effectiveness with these reports, many viewers simply do not know. As one viewer puts it:

"I do recall he was competent but not memorable."

"Nothing else can actually be said about Mason Granger at this time. He has not captured the viewers' attention enough to analyze his impact further, but in reality, this does say something about Granger's effectiveness and impact to date. Either of two things is presently occurring: either he is not being show-cased properly or used often enough to allow his talents to be revealed to area news viewers, or he is simply not capturing viewers' attention with his reports. In any event, Mason Granger is currently getting "lost in the crowd."

Q. As a result of this report, did you decide to show-case Mr. Granger?

A. I don't recall.

The same report showed these "total recognition" factors: Lowery, 74.3%; Granger, 21.5%; and Cooper, 8.3%. The same report showed an evaluation of the same personalities:

| | Lowery | Granger | Cooper |
|---|---|---|---|
| Excellent | 16.5% | 5.8% | 3.0% |
| Good | 49.5% | 34.8% | 18.2% |
| Fair | 13.8% | 12.0% | 12.1% |
| Poor | 1.7% | 1.2% | 0 |

Mr. Greiner, Mr. Gardner and Mr. Greaney testified they were aware of these reports. Mr. Gardner and Mr. Greiner testified that these two, Cooper and Granger, were hired for their "potential."

The record and testimony support a finding that plaintiff, however, was judged by a different standard. In a memorandum written by Mori Greiner to Myron Lowery on September 26, 1984, Mr. Greiner expressed the following conditions for discussion of Mr. Lowery's future:

*The Future*

You are ambitious, which is good, and impatient which is bad.

While it might soothe you temporarily if I hinted at the possibility of rapid advancement and big money not far down the road, that would be a crummy thing to do. I like you personally, for whatever that's worth, and admire your energy. But I'm hesitant to speculate on the future until you exhaust the opportunities in your present speciality—until everybody says, "That Myron Lowery is the best damned television reporter in Memphis."

When questioned during direct examination by counsel for plaintiff about this memorandum as it related to plaintiff's opportunity for advancement at WMC–TV, Mr. Greiner testified as follows:

Q. All right. Let me ask you to turn to page 227. Well, before I do that, I want to ask you something else. Do you remember a memorandum that you wrote to Myron Lowery telling him that if advancement was possible when he became, when you heard people say that he was the best damned news reporter in Memphis?

A. Yes, sir, I said a discussion of your future can be had at that time I believe.

Q. Well, isn't it indeed correct, Mr. Greiner, that it's your position that Mr. Lowery was not advanced to the position of weekday anchor because you had not, he had not achieved that fact, that is to say, that everyone was saying that Myron Lowery is the best damned television reporter in Memphis?

A. I think that's the last sentence, If I remember, Mr. Donati, of a three or four page memorandum. I said when everybody said he was the best reporter in town that we would talk about other things. Isn't that essentially what it says?

Q. Well, let me ask you this question, Mr. Greiner, and I will ask the question as clearly as I can, isn't it the reason that Mr. Lowery didn't advance, isn't the reason that he didn't advance, is because people did not tell you that he was the best damned news reporter, that everybody didn't say that he is the best damned news reporter?

A. Mr. Lowery had a large number of shortcomings that we discussed then, orally and in writing, many far beyond that.

Q. Let me ask you if you remember this statement being made in your deposition. Page 116. Referring to the memo that you wrote concerning that quote.

"Is it your position that during the exchange of these memos and conversations that you had in effect told Mr. Lowery that he was not headed, that he was not likely to be anchor at 5 o'clock and 10 o'clock?

Answer. Well, I may have—if I may complete the sentence."

Mr. Greiner in later testimony described his comment, "best damned television reporter," as merely a figure of speech. He stated that standards by which Mr. Lowery was measured were identical to those applied to other employees.

WMC–TV management conceded that the station used only subjective criteria for evaluating performance, but contended this was an industry-wide practice. They conceded as well that no formal announcements of job openings were posted. They depended rather on the "open atmosphere" of the newsroom.

During testimony in response to questions by counsel for Mr. Lowery, Mr. Gardner testified that Mr. Lowery was a serious candidate for the anchor position in 1977. As proof defendant attempted to show all candidates (the aforementioned five) rotated as co-anchors. However, Mr. Lowery testified, he was unaware there was any selection process implemented for the anchor spot or even that it was open. WMC–TV's explanation was that employees were aware due to the openness of the newsroom, and everyone had just a general knowledge of these things.

Just as significant is the admission made by Mr. Greiner that Mr. Lowery was never really considered for a weekday anchor position. This statement arose in the context of the availability of contracts for some anchors but not Mr. Lowery:

Q. Is it fair to say that under the terms of the duties of Mr. Roger Cooper, Mr.

Myron Lowery had the same types of duties at the time of this contract?

A. No, sir, I wouldn't say that was fair. It was never contemplated that Mr. Lowery would be a featured weekday anchor. And that was the purpose, the primary purpose of granting this contract.

The spontaneity of the comment can only increase its reliability.

After his promotion to anchor Mr. Cooper was the subject of the following comments made in a Magid "focus group analysis," a report of select viewer comments regarding various WMC–TV personalities:

*Roger Cooper*

In comparison to other anchor personalities, Roger Cooper elicited more negative reaction. Of key note was the respondents' perception that Roger Cooper does not fit into the total Channel 5 news team. Viewed by many respondents as inexperienced. Roger Cooper displays to most a nervous, bland exterior. Several respondents mentioned the fact that Roger Cooper seems to be trying to fit into the WMC–TV news style but is failing in the attempt. His inexperience seems to be paramount in the minds of most respondents, as they would state that Roger Cooper would be unsure of himself in any environment.

On the positive side, the only strong point mentioned concerning Cooper was his appearance. He is felt to be good-looking and, in the minds of some, could become a much more professional broadcaster if he could "loosen up a little." All in all, Roger Cooper is, at the present time, making a certain segment of the viewing audience extremely nervous by his lack of experience and confidence in himself.

In contrast, the reaction by these same viewers to Mr. Lowery was "extremely favorable":

*Myron Lowery*

General reaction to Myron Lowery was extremely favorable. Respondents view Lowery as a professional who indeed fits into the Channel 5 image. Also mentioned was Lowery's ability to bring light humor into his newscast and thus become more relaxed and natural in his delivery. In this regard, viewers mention the ability of Lowery to adapt between news stories very well in that he "knows when to act serious and when to act funny." Definitely perceived as a team person. Lowery is felt to have greatly improved in his broadcasting in the recent year. His sincerity and relaxed professionalism have definitely aided Channel 5's overall news effort.

In spite of the stations continued dissatisfaction with Mr. Cooper's performance, WMC–TV entered into a new two-year contract with him in January 1980. Three months later he was relieved of his anchor duties and returned to reporting. He subsequently left the station.

In March of 1983, reporter Joe Birch was promoted to weekday anchor. He too was promoted, according to defendant's testimony (Mr. Greiner), because he had "potential" to become a valuable anchor.

The Court finds the foregoing facts sufficient basis for a finding of intentional racial discrimination. However, numerous other events and circumstances also contribute to the overwhelming factual basis for such a conclusion.

For instance, former WMC–TV News Department employee Sherry Rosen described her impressions of the environment at WMC–TV concerning discrimination against black employees. Rosen, who is presently active in local radio, served from the summer of 1977 until summer of 1978 as the station's researcher. She was at the station approximately thirty-five hours a week working in the open newsroom along with Ron Michaels, the assignment editor; Jim Zarchin, executive producer; Gaylon Reasons, chief producer; and Frank Gardner. She was frequently at work in the morning when reporters received assignments. Reporters generally left after these assignments, and she was left working in the newsroom, sharing a work area with Mr. Zarchin and Mr. Michaels.

Due to the design of the newsroom, she stated, she could see and hear many conversations among management. She relat-

ed management's jokes about giving Sylvia Black, a black reporter, "garbage stories," and that Ms. Black's appearance and voice were subjects of management's conversations as well. When Ms. Black and Hank Lockhart, another black reporter, were terminated, Rosen heard a newsroom management person make statements that "we need a black female." Usually these conversations included comments such as "I hope we can get one that looks good on camera and can speak English." Participants in those conversations were Mr. Zarchin, Mr. Michaels, and Mr. Reasons, all white males.

From her observations she also sensed that black reporters were assigned the inferior stories and were last to receive cameramen for assignments and generally were treated with less patience than their white counterparts. She particularly noticed that the biggest stories went to Mr. Granger and Mr. Cooper. Overall, the conversations, she indicated, were degrading. However, she also indicated management generally spoke favorably of the plaintiff and seemed in awe of the amount of work he performed and were impressed with his work. Ms. Rosen also made a particularly significant comment: Management's conversations indicated they considered weekend news to be "black news."

In its attempt to discredit Myron Lowery and justify denial of promotion, WMC–TV introduced a parade of written reprimands and negative criticisms of Mr. Lowery's conduct and performance. WMC–TV stated that other employees had received written reprimands and criticism. Upon probing by Lowery's counsel, however, WMC–TV could not produce for any other employee, even those terminated for poor performance, such extensive documentation of alleged errors and mistakes. One witness, Frank Gardner, attempted to justify his extensive record-keeping of Lowery's errors by stating he only viewed Lowery's performance on weekends when he was at home and the notes were necessary as a reminder for discussion the following week. WMC–TV also advanced the notion that Lowery was a prolific memo writer and "self-promoter" and that was justification

enough for WMC–TV's like action. In contrast, praise of Lowery was generally not written, but oral, although WMC–TV introduced some memoranda praising Mr. Lowery. No white reporters were subjected to this extensive written criticism. The presence of negative overdocumentation further contributes to the overwhelming cumulative effect of intentional racial discrimination against Mr. Lowery.

■ From the facts, the Court can only conclude that Mr. Lowery has established a prima facie case of racial discrimination. He clearly met the threshold requirements for an anchor. His educational background was certainly adequate, he had extensive actual anchor experience, and had demonstrated quality and award-winning work. Mr. Lowery's Magid reports indicated areas of needed improvement but also indicated high ratings in other areas. WMC–TV selected, in preference to Mr. Lowery, two white males, both reporters without experience as anchors. Their Magid reports at time of promotion consisted of equally mixed criticism. Mr. Cooper's was clearly negative in many respects.

The determinative difference in the selection process was Mr. Lowery's race. There is substantial evidence in the record to support the Court's finding of a causal connection between Mr. Lowery's race and the alleged acts of WMC–TV. Plaintiff has shown sufficient facts to sustain the inference that the denial of promotion to anchor was racially motivated and that he was treated in a dissimilar manner from white males similarly situated. Once a prima facie case is established, the court properly may infer discriminatory animus based upon the defendant's actions, because "... these acts, if otherwise unexplained, are more likely that not based on the consideration of impermissible factors." *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978).

To overcome this presumption of discriminatory animus, once the plaintiff establishes a prima facie case, the defendant must articulate some legitimate, nondiscriminato-

ry reason for its actions. *McDonnell Douglas* and *Burdine, supra.* Even if the defendant meets the burden of producing a nondiscriminatory reason for its actions, the plaintiff may prevail by proving by a preponderance of the evidence that defendant's proffered reason is pretextual. *Burdine, supra; Becton v. Detroit Terminal of Consol. Freightways*, 687 F.2d 140, 141 (6th Cir.1982).

WMC–TV's articulated reasons for denying Mr. Lowery's promotion to weekday anchor included its claim that he was unqualified because he had problems with his speech and work habits, and especially a propensity for making mistakes. It was the contention of management that Mr. Lowery had reached a plateau in his professional development preventing his further progress.

■ WMC–TV's own admissions dispel any notions that these reasons were nothing more than pretextual. Mr. Greiner, the station's top executive, stated—inadvertently—that Mr. Lowery was never really a candidate for promotion to weekday anchor. Mr. Greiner imposed on Lowery a "black superstar" standard. To even initiate discussion about his future at the station, Mr. Lowery was required to reach stellar performance, the "best damned television reporter in Memphis." An all white management team would determine by entirely subjective criteria when Mr. Lowery reached this goal. Until Mr. Lowery progressed to the satisfaction of station management, he would remain an anchor on the "black news." Meanwhile, white males were to be awarded promotions because they had "potential." Nowhere is the impression of racial discrimination more apparent than in management's decision to promote Roger Cooper to weekday anchor.

As part of its attempt to rebut Lowery's claims, WMC–TV introduced evidence of its involvement in the civil rights movement in the sixties under the leadership of Mori Greiner who also became Station Manager in 1964 and General Manager in 1966 of WMC–TV. The station's various involvements included making station facilities and air time available to the black community as a means of communicating concerns of the black community, establishment and involvement in various public service endeavors focused on the racial problems in the city, support for programs in the schools aimed at easing racial tensions and increasing communication. Mori Greiner has been recognized by various organizations for his participation in the civil rights movement. The Court takes note of these past efforts by WMC–TV and Mr. Greiner to ease racial tension in the community.

It is WMC–TV's contention that its efforts show a commitment to black and community-oriented programming, that the station has distinguished itself in this area. It is further contended that this same commitment has transferred to its recruitment and training of black employees, thereby negating Lowery's charges of purposeful racial discrimination. WMC–TV has in fact shown an increase in black employees since 1964 when it employed from the so-called black community one black employee. In this regard WMC–TV introduced testimony concerning Federal Communication Commission (FCC) rules and guidelines. According to these rules, certain licensees (in the instant case, applicable to those broadcasters with five or more employees) are required to file an annual statistical profile of employees, or Form 395. These rules are aimed at preventing discrimination in employment practices, and the reports provide review of employment practices in an effort to further these goals. The FCC also requires for renewal of a license a written equal opportunity program adopted by the broadcaster. The FCC guidelines, according to testimony by Mr. Greiner, have required larger stations such as WMC–TV to employ "a percentage of minority employees equivalent to 50 percent of the percentage of that minority in the workforce."

Defendant's records for the pertinent periods were introduced as evidence and both defendant and plaintiff elicited testimony, especially through Mr. Greiner, in regard to these reports and statistics included in these reports. The Court con-

cludes that the defendants, while not in violation of FCC rules, have maintained only minimum requirements. For instance, Form 395 analysis for years 1976 through 1983 indicates defendant increased its total employment of full-time minority employees from 20.3% to 21.5%, or less than a two percent increase over the eight year period. Minority employees ranged from 24 individuals in 1976 to 27 in 1983. The minimum minority percentage for WMC–TV, according to the proof, for the period in question was approximately 16%.

Moreover, these records show that minorities at the station did not serve in positions with decision-making responsibilities. At the time of the trial, only one black, Dr. Hollis Price, WMC–TV's Urban Affairs Director, had served in a decision-making position. Of those black professionals at the station, station statistics show a disproportionate number were placed in highly visible positions, adding credence to plaintiff's charges of "window dressing," or the practice of placing black and female faces on the television, while denying them decision-making roles behind the cameras.

While defendant contends these statistics reinforce their denial of racial discrimination, the Court finds instead that these numbers reasonably support a contrary conclusion. The Court can infer only minimal compliance from a defendant claiming commitment to racial harmony in the community and commitment to applying the goals to the work place.

Considering all of the testimony and record, and evaluating the objectivity, sincerity and credibility of the witnesses, the Court concludes that the failure to promote Myron Lowery was racially motivated. The treatment afforded Mr. Lowery was vastly different from that given Mr. Cooper, Mr. Granger and Mr. Birch, all white males.

The Court does not intend to suggest WMC–TV does not have discretion to choose its anchors. It does. The civil rights laws were not intended to affect an employer's discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria. See *Nichelson v. Quaker Oats*, 573 F.Supp. at 1227, (citing *Burdine, supra*).

The Court notes that much of the negative treatment of Mr. Lowery, as well as treatment of other blacks at the station was subtle. These facts taken in their entirety suggest a treatment of blacks that cannot be ignored. Title VII and 42 U.S.C. Section 1981 tolerate no racial discrimination in employment, subtle or otherwise. *Burroughs v. Marathon Oil Co.*, 446 F.Supp. 633, 638 (E.D.Mich.1978).

### RETALIATION CLAIM

Mr. Lowery filed this lawsuit on September 10, 1981. Four days later, general manager Mori Greiner removed Mr. Lowery from all on-air duties. Plaintiff claims he was removed in retaliation for filing this suit. Defendant's proffered reasons, based on Mr. Greiner's subjective belief that Mr. Lowery would use his air time to publicize his suit and harm the station, have no basis in fact and are clearly pretextual.

Mr. Greiner testified he learned the complaint had been filed by reading about it in a local newspaper the next morning. Three days after the suit was filed on September 10, 1981, defendant received a copy of the complaint. Filed with the complaint was a copy of Mr. Lowery's E.E.O.C. charge with attendant factual allegations.

On September 15, 1981, Mr. Greiner met in his office with Mr. Greaney and two other members of the newsroom's supervisory staff and Mr. Lowery. Mr. Lowery was told he was removed from the air due to the lawsuit. Mr. Greiner stated he believed Mr. Lowery was seeking publicity for the suit and would use the airwaves news to promote his interest. His basis for such belief was that the newspaper articles contained detailed factual information and made reference to an accompanying statement. He stated his belief that Mr. Lowery was a self-promoter was further basis for his decision.

Apparently "much later" Mr. Greiner finally read the complaint and attachments. He admitted that it contained much of what had appeared in the newspaper articles. Defendant protests that certain informa-

tion, i.e., references to Mr. Lowery's education, was not in the complaint nor was it reported in a previously published article featuring Mr. Lowery. Mr. Greiner conceded however, that the defendant kept news files with biographical information on its news personalities.

During trial, Mr. Greiner admitted he had no proof Mr. Lowery had given any information to the press. He did not question Mr. Lowery, or speak with him otherwise apparently, nor did he attempt to verify his suspicions by contacting the press. In fact, he made no attempt to investigate the matter at all. He could show no prior occasion when Mr. Lowery had abused on the air his position as a newscaster.

In an attempt to refute plaintiff's suggestions that Mr. Greiner reacted to the suit in anger or embarrassment, defendant asserts it was in contact with its counsel as many as three times between the filing of the complaint and Mr. Lowery's removal from the air. Viewed in that light, the court could conclude the defendant's act was intentional and deliberate. This assertion, however, is contrary to Mr. Greiner's statements made during deposition. He indicated he was embarrassed and humiliated by the news article reporting Lowery's suit. Mr. Greiner also admitted he was aware when the suit was filed that he was to receive an award from the National Council of Christians and Jews. The record shows the date of the award was to have been September 15, 1981.

Mr. Greiner in his deposition made statements indicating he knew Mr. Lowery was "genuinely upset by not being on the air," and that Mr. Lowery's being on the air "was obviously an important thing to him." In his testimony during trial he explained these prior statements by relating remarks made by Mr. Lowery that for him being on the air was an "ego trip." Mr. Lowery made this statement when he was the subject of a newspaper article.

Mr. Lowery remained off the air approximately one month, but due to prearranged absences, vacation and regularly scheduled time off, he was off the air nine-and-one-half working days. During this period he remained in the newsroom answering the phone, sitting at the assignment desk, researching stories, writing copy for newscasts. While Mr. Lowery would have performed some of these duties as weekend anchor anyway, he of course would not have done so on a full-time basis. He also indicated he was asked to write copy for other reporters, a task he normally would not have been required to do. His salary was not decreased during this time.

Mr. Greiner restored Mr. Lowery's on-air duties on October 13, 1981, after securing Mr. Lowery's assurances that he would not use the airwaves to argue his case.

In the meantime, on September 23, 1981, Mr. Lowery filed his second charge of discrimination with the EEOC, which subsequently issued a probable cause determination on that charge.

Defendant contends Mr. Greiner's belief that Mr. Lowery would bring harm to the station by making self-serving statements on the air was sincere and reasonable. The Court concludes these subjective beliefs had no basis in fact and were not reasonable.

■ Plaintiff has made out a prima facie case of retaliation. He has shown exercise of a federally protected right in protest of racial discrimination, that as a result he was subjected to adverse action by his employer WMC–TV, and that filing this suit was linked to WMC–TV's retaliatory action.

WMC–TV attempted to rebut this evidence by coming forward with a legitimate, nondiscriminatory explanation for its conduct: Mr. Lowery was taken off the air, not for filing the suit, but instead because Mr. Greiner believed plaintiff had sought out and encouraged publicity for his suit, and because Mr. Greiner feared Mr. Lowery would continue in this pursuit or would make defamatory remarks on the air. The record does not support defendants contention that the articulated reason, the interest of the station, was the actual reason for WMC–TV's action. Based on the law and facts, the Court concludes plaintiff has demonstrated by a preponderance of the

evidence that WMC–TV's articulated reasons are pretextual.

Mr. Lowery has shown, indeed defendant admits, that but for the filing of this action, Mr. Lowery would not have been removed from the air. Defendant made no attempt to investigate its suspicions. In light of the brief span of time—four days—and Mr. Greiner's obvious discomfiture and absence of any factual support for defendant's explanation, the Court finds defendants proffered reasons to be merely pretextual.

Plaintiff thus prevails on his Title VII retaliation claim.

### Discrimination In Terms, Conditions and Privileges Employment: Denial of a Contract

The plaintiff in the instant case also alleged that the defendant violated the law by its refusal to make a written employment contract with him. The employment contract is clearly a benefit which was bestowed on similarly situated white employees but denied to the plaintiff. "The benefit a plaintiff is denied need not *be* employment to fall within Title VII's protection: it need only be a term, condition or privilege *of* employment." *Hishon v. King and Spalding,* 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

In this case, the Defendant freely made available to the similarly situated white employees written employment contracts which had as the chief benefit a larger compensation term than noncontractually retained employees who were subject to a salary scale. The contract in essence was a device used by WMC–TV to go outside the salary scale and confer additional compensation, featured status, and other terms, benefits and privileges of employment upon certain white employees during Lowery's tenure at the station.

Myron Lowery easily established a prima facie case under Title VII. In the face of this prima facie case, WMC–TV proffered no legitimate, nondiscriminatory reason for the denial of a contract to Myron Lowery. Accordingly, Mr. Lowery prevails on this issue.

### The 1981 Claims

The plaintiff also claimed that the foregoing claims constituted discrimination under 42 U.S.C. § 1981. "A person alleging a § 1981 violation must first establish that his employment terms vary from those which his employer accords to similarly situated white worker." *Long v. Ford Motor Co.,* 496 F.2d at 505–506. The *McDonnell Douglas* principles on the order and allocation of proof also apply in a Section 1981 case. *Grubb v. W.A. Foote Memorial Hospital, Inc.,* 741 F.2d 1486, 1493 (6th Cir. 1984) ("This allocation [*McDonnell Douglas* and *Burdine* allocations] of the respective burdens may also be applied in the adjudication of race discrimination claims arising out of 42 U.S.C. § 1981."). In this regard, the plaintiff has prevailed under Section 1981 on his claims of wage discrimination and promotion.

The remedies available under Title VII of the Civil Rights Act of 1964 and under Section 1981 are coextensive. They augment each other and are not mutually exclusive. *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 459, 95 S.Ct. 1716, 1719, 44 L.Ed.2d 295 (1975). A private plaintiff who sues under both statutes may obtain equitable relief under Title VII and compensatory and punitive damages under Section 1981. *Harris v. Richards Manufacturing,* 675 F.2d 811, 814 (6th Cir. 1982).

In regard to the claim of discrimination in denial of a contract, the black letter language of 42 U.S.C. § 1981 is most relevant to an analysis of this issue. The statute reads:

§ 1981. Equal rights under the law

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pain, penalties, taxes, licenses, and exactions of every kind, and to no other. (R.S. § 1977).

■] When a person sues under Section 1981 to enforce his right not to be discriminated against in private employment, he must show that he was unable to make or enforce a contract that white citizens were able to make or enforce. When an employer, public or private, places more stringent requirements on employees because of their race, Section 1981 is violated. The purpose for which Section 1981 was enacted to afford equal opportunities to secure the benefits of American life regardless of race-requires that a Court adopt a broad outlook in enforcing Section 1981. *Long v. Ford Motor Company, supra.*

The defendant's racially biased denial to the plaintiff of an employment contract clearly falls within the ambit of 42 U.S.C. § 1981.

The Sixth Circuit has noted that the discriminatory intent necessary to prove a Title VII claim also serves to prove the discriminatory intent requisite to a finding under the Civil Rights statutes.

■ Accordingly, where, as here, the plaintiff has proved violations of Title VII, he has likewise proved purposeful discrimination and violation of Section 1981 and is entitled to compensatory and punitive damages. For the reason stated above, based upon those facts as well as all the evidence, the Court finds that plaintiff has demonstrated purposeful discrimination on each claim for relief.

*Claim of Salary Discrimination*

■ In order to establish a prima facie case of discrimination in compensation, the plaintiff must show:

1. that he is a member of a protected class; and
2. that he is paid less than a member of a different race for work which requires substantially the same responsibilities.

*Uviedo v. Steves Sash and Door Co.*, 738 F.2d 1425 (5th Cir.1984); *Pittman v. Hattiesburg Municipal Separate School District*, 644 F.2d 1071 (5th Cir.1981).

■ In this case, based on the record, on the demeanor and credibility of the witnesses who testified, the Court finds that plaintiff performed substantially the same work as the white employees who worked under employment contracts and who served as weeknight and weekday news anchors. Myron Lowery was a valuable employee of WMC–TV for twelve years. For nearly ten years, Mr. Lowery served as a weekend anchor in more than twelve hundred individual broadcasts. In that role he maintained for his employer a high viewer rating. In addition, he performed as a weekday reporter and the writer, producer, and director of "Minority Report." Mr. Greiner admitted that the job duties and job skills of the weekday anchor were very similar to those of weekend anchor. Clearly, Mr. Lowery performed substantially the same work as Cooper, Granger and Birch who were under employment contracts.

Once the plaintiff establishes the prima facie elements of his wage disparity claim, the burden of production then, of course, shifts to the defendant in light of the *Burdine* case and then the plaintiff must show pretext. *Pittman*, 644 F.2d at 1075. Typically, this burden of production results in an employer raising qualification issues. For instance, in the *Pittman* case, the employer alleged the white employee who previously held Pittman's job was paid at a higher rate because he had a greater degree of administrative and managerial skill and ability. In that case, the court made short order of such a defense by noting Pittman had consistently performed acceptable work and received merit raises. The court noted, "The clear implication of all this is that, because Pittman did acceptable work as head of the Printing Department, the defendant was very much interested in keeping him on since as a black he could be paid much less than a white for doing acceptable work." *Id.* at 1076.

The same reasoning applies in this case. Mr. Lowery had a long career with WMC–TV and was called upon to perform as a genuine jack of all trades. He was required to anchor, produce, report, write and host a television show. Quite simply, it appears the defendant was interested in employing plaintiff because it could exact

so much from him for so little (and so unfair) a price.

It appears to the Court that the defendant failed to meet its burden of production on this issue. At trial, the defendant denied the discrimination and stood on its claim that Mr. Lowery did not perform substantially the same work. Indeed, Myron Lowery performed substantially the same work *and more* than the similarly situated white employees. In the hope of establishing differing job duties, WMC–TV claimed the weeknight anchor positions were substantially different from the weekend anchor position.

Defendant, in order to rebut the presumption of discrimination, contended the pay differences were not due to race. WMC–TV claimed it is an industry-wide practice to pay weekday anchors more than weekend anchors. WMC–TV argues more revenue is produced by the station during the week than on weekends. It claims Mr. Granger, Mr. Cooper, Mr. Birch and Mrs. Wood anchored weekdays. The fact is, however, that when Mrs. Wood, a black female anchor, joined WMC–TV as a featured anchor, she performed in the same weekend anchor position Mr. Lowery had occupied for years. The station claimed this was to accommodate her religious views. However that might be, economics apparently made no difference in this part of Mrs. Wood's assignment. The Court therefore finds this claim by WMC–TV, considered in the context of the entire record in this case, to be pretextual. Such a transparent position merely speaks to the *time* the job duties are performed and not to the duties of the jobs themselves. Where the duties are performed at different times, the analysis of the case remains the same. *Pittman,* 644 F.2d at 1074.

At trial, the plaintiff easily established that the wage rate was inequitable by producing evidence as to the responsibilities and prevailing wage rates for similarly situated white employees. For example, in 1980 Mason Granger made $32,030.00 while plaintiff performing substantially the same work made only $24,945.00. The same year, Roger Cooper who was considered

deficient as an anchor and was removed in March 1980, made $30,650.00. Thus, the plaintiff's claim of salary discrimination and the inference of race discrimination is unrebutted. Therefore, the plaintiff prevails on this issue.

### The Procedural Issues

Prior to trial, the defendant raised two procedural issues of importance. First, the defendant claimed the plaintiff filed his charge of discrimination with the Equal Employment Opportunity Commission outside the time allowed by law. Second, the defendant urged that the Section 1981 claim was filed outside the statute of limitations. The Court has already ruled, in response to the defendant's motion for summary judgment, that the claims of the plaintiff are not time-barred. See, Order Denying Motion for Partial Summary Judgment (March 21, 1985). Nevertheless, the defendant again raised these issues at trial and the Court feels constrained to address them. Once again, these claims are denied and the Court finds that the plaintiff's claims are not time-barred.

First, as to the timeliness of the charge, it is evident from the face of the charge that the plaintiff alleged a series of discriminatory acts ranging from all the claims enumerated herein to a variety of "terms and conditions" claims. The most noteworthy alleged discrimination referred to in the charge was the continuing salary discrimination and the promotions of Cooper and Granger.

The key cases on this issue are *Held v. Gulf Oil Co.,* 684 F.2d 427 (6th Cir.1982) and *Roberts v. North American Rockwell Co.,* 650 F.2d 823 (6th Cir.1981).

In *Roberts,* the Court reasoned:

The problem is that both the complaint filed in this case and the limited record before us support the plaintiff's contention that she was subjected to an ongoing pattern of discrimination ...

The issue becomes more difficult when a company fails to hire or promote someone because of their race or sex. In many ongoing discriminatory policy which seeks to keep blacks or women in low-level positions or out of the company

altogether. In such cases, courts do not hesitate to apply what has been termed the continuing violation doctrine. [citation omitted].

*Id.* at 826. In the *Roberts* case, the plaintiff proceeded on a disparate treatment theory in her failure to hire case.

In *Held,* the Sixth Circuit explained the continuing violations doctrine in more detail. There, the Court ruled:

Thus, if the discriminatory acts commenced prior to the 180 day period and there was a continuous pattern of discrimination that continued into the 180 day period, plaintiff may still maintain her action even though single discriminatory acts prior to the 180 day period are barred.

*Id.* In *Held,* the plaintiff was terminated on December 15, 1977 and filed her EEOC charge on February 16, 1978. Although no single act of discrimination occurred within the 180 day period prior to February 16, 1978, the plaintiff was allowed to maintain her action on the basis of the continuing violations doctrine.

 Simply put, the test of the continuing violations doctrine is whether the plaintiff filed a charge of a present violation which is part of an ongoing pattern of discrimination. *Roberts,* 650 F.2d at 828, *Curry v. United States Postal Service,* 583 F.Supp. 334, 343 (S.D.Ohio 1984), *Janikowski v. Bendix Co.,* 603 F.Supp. 1284, 1291 (E.D.Mich.1985).

 The preponderance of the evidence in this case shows that racial discrimination was standard operating procedure at WMC–TV. It was the regular rather than the unusual practice. *Senter v. General Motors Corp.,* 532 F.2d 511 (6th Cir.1976), *cert. denied,* 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976).

In the instant case, the plaintiff did not allege in his charge a single discrete act of discrimination. Rather, he alleged present violations—most notably, salary discrimination and discrimination in promotions— which were a part of an ongoing pattern of discrimination. Further, the record clearly establishes an ongoing pattern of discrimi-

nation. The defendant's general manager admits that the station was segregated prior to 1964 and did not begin to hire blacks until after that date. Mr. Lowery was the first full-time black reporter. All of the defendant's executives and newsroom managers were white. Plaintiff continuously asked for advancement and promotion but was repeatedly denied an opportunity to be promoted to a weekday anchor or a management position. Numerous black reporters were forced to leave the station because of a failure to advance. Clearly this evidence, as well as the entire record, establishes a pattern of denial of promotion to blacks. Additionally, the effects of the promotion of Cooper and Granger in December of 1977 continued through March of 1980. In March 1980 Granger received an additional promotion to weekday and to five o'clock and ten o'clock weekday anchor. These acts occurred well within a 180 day period prior to plaintiff's filing of his charge. To the extent that the promotions commenced prior to the 180 day period, there was a continuous pattern of discrimination that continued into the 180 day period and indeed beyond that date. Further, in regard to the salary discrimination claim, each time the plaintiff received a pay check the discrimination occurred and continued. *Hall v. Ledex, Inc.,* 669 F.2d 397, 398 (6th Cir.1982) ("Furthermore, the discrimination was continuing in nature. Hall suffered a denial of equal pay with each check she received.") Thus, plaintiff's claim under Title VII are not time-barred.

In regard to the plaintiff's claims under 42 U.S.C. § 1981, the Court finds these claims likewise are not time barred. The plaintiff filed his original complaint on September 10, 1981. In an amended complaint filed on September 20, 1984, he alleged violations of 42 U.S.C. § 1981. Several courts of appeal have recognized the continuing violations doctrine in regard to 42 U.S.C. § 1981. *Williams v. Owens-Illinois, Inc.,* 665 F.2d 918 (9th Cir.1982); *Jenkins v. Home Insurance Co.,* 635 F.2d 310, 312 (4th Cir.1980); *Allen v. Amalgamated Transit Union Local 788,* 554 F.2d 876, 880–81 (8th Cir.), *cert. denied,* 434 U.S.

891, 98 S.Ct. 266, 54 L.Ed.2d 176 (1977). Further, in this regard, the Court finds that the amended complaint also relates back to the filing of the original complaint.

■ The test of the relation back doctrine as applied in this case is whether there is a "factual nexus between the amendment and the original complaint" and whether the defendant "had notice of the claim and will not be prejudiced by the amendment." *Grattan v. Burnett*, 710 F.2d 160, 163 (4th Cir.1983). Under principles of liberal construction, an amendment is to relate back if this test is met.

■ Because the elements of the Title VII claims and the Section 1981 claims are substantially identical and arise out of the same facts and circumstances, it goes without saying that there is a factual nexus between the amendment and the original complaint in this case. Likewise, the defendant was put on notice with the filing of the charge with the Equal Employment Opportunity Commission that an action under the Civil Rights Act might well be brought. Because the evidence required in the Title VII action is substantially the same required in a Section 1981 action, the defendant is not prejudiced. Accordingly, the Section 1981 claim plainly relates back and is not time-barred.

*The Remedy*

In terms of the equitable relief under the Title VII violations, the backpay to be awarded is $74,120, based on comparison with the salary received by Mason Granger during the relevant time period:

| | Granger | Lowery |
|---|---|---|
| 1978 | 23,772 | 19,977 |
| 1979 | 27,500 | 20,992 |
| 1980 | 32,030 | 24,945 |
| 1981 | 40,000 | 24,627 |
| 1982 | 55,000 | 28,194 |
| 1983 | 35,000 (7 months at $60,000 per year) | |
| | | 20,453 (resigned 8/4/83) |
| | $ 213,302 | $ 139,182 |

In regard to compensatory damages, it is well established that compensatory damages may be awarded in a case such as this one for embarrassment, humiliation and mental anguish:

Section 1981 doubtless was intended to give the former slaves access to opportunities for material betterment of themselves, but it was also intended to remove the stigma which accompanied the disabilities under which they had formerly labored. The plain command of the statute is that those formerly enslaved henceforth shall be treated as having all of the rights and dignity of other people dwelling with them in a land of freedom. A denial of those statutory rights is treatment of the victim as being subject to those earlier disabilities. It is an affront, of which embarrassment and humiliation are natural consequences. If the statute is to be enforced fairly, if injuries suffered directly because of its violation and to be fairly compensated, damages for embarrassment and humiliation must be recoverable in a case such as this.

*McCrary v. Runyon*, 515 F.2d 1082, 1089, (4th Cir.1975).

"Such damages for emotional distress may be inferred from the circumstances as well as proved by the testimony." *Harris v. Richards Manufacturing Co., Inc.*, 511 F.Supp. 1193, 1205 (W.D.Tenn.1981). *aff'd in part, rev'd in part*, 675 F.2d 811 (6th Cir.1982).

In order to award such damages, however, the Court must find "a sufficient casual connection between the defendant's illegal actions and the injury to the plaintiff." *Id.* at 1206. In this case, the Court finds the requisite casual connection between the humiliation, embarrassment and mental distress caused to Myron Lowery by WMC–TV's continuing discrimination and retaliation against him. The ultimate in humiliation was realized, of course, when Lowery was forced from his on-air responsibilities in the wake of his filing of his Title VII lawsuit. Such action shamed Mr. Lowery before his coworkers and the community and had an obvious devastating effect upon him. Prior to this, Mr. Lowery was continually humiliated and embarrassed by being passed over for promotion, being denied an employment contract, and

being paid less than similarly situated white employees. Myron Lowery proved damage to his reputation and likewise proved humiliation and embarrassment. Thus, the Court awards Mr. Lowery $100,-000.00 compensatory damages for emotional distress, embarrassment and humiliation.

Likewise, Myron Lowery is entitled to an award of punitive damages in this case. Where a defendant has exhibited oppression, malice, gross negligence, willful or wanton misconduct, or a reckless disregard for the civil rights of a plaintiff, punitive damages are to be awarded. Without a doubt, WMC–TV's conduct in this case was malicious and oppressive and indicated that it removed Myron Lowery from the airwaves because he had filed his Title VII lawsuit. The only rational motivation the Court can reasonably infer from this conduct is that WMC–TV wished to punish Lowery for exercising his statutory rights, to shame him in the public eye and to communicate to his coworkers and the Memphis community that objection to alleged unlawful employment practices would not be tolerated. Such actions constitute a malicious intent by the defendant to harass, intimidate, embarrass and ridicule the plaintiff. In a society such as ours where law and justice are held in high esteem, such outrageous conduct is unacceptable. *Id.*

The remedy in regard to the Section 1981 claim is easily discerned. The conduct of WMC–TV in this action was just plain wrong and reprehensible. While claiming to be a leader in "the forefront of the civil rights movement," it chose to follow a different course behind its office doors. The station management put on one face in the public eye and another in private where it had perhaps its greatest opportunity to further the principles it seeks so hard to convince the Court it has always held dear. The denial of advancement and continuing discrimination in violation of 42 U.S.C. § 1981 embarrassed and humiliated Myron Lowery. When Mr. Lowery chose to challenge the racially discriminatory practices of the management of WMC–TV, he became the victim of unlawful retaliation. By subjecting him to retaliation, WMC–TV struck out at, not only Mr. Lowery's livelihood and reputation, but also the foundation of the legislation designed to protect Lowery's civil rights. The racially motivated conduct of WMC–TV's management was illegal, malicious and oppressive. Therefore, an award of punitive damages is appropriate. In light of the wrong done to this employee who was with the television station twelve years, and the wealth of WMC–TV, whose total current assets in 1983 were $143,430,000.00, the Court awards Myron Lowery punitive damages in the amount of $100,000.00.

It is therefore, by the Court, Ordered that plaintiff, Myron Lewis Lowery, Jr., is hereby awarded judgment against the defendant, WMC–TV in the following monetary sums:

1) $74,120.00 in backpay.

2) $100,000.00 compensatory damages

3) $100,000.00 punitive damages.

In addition, WMC–TV is to pay to the plaintiff a reasonable amount for attorney fees and expenses. Accordingly, plaintiff's counsel is directed to submit to the Court within thirty days from the date of this order affidavits setting forth reasonable fees and expenses. WMC–TV may respond to such affidavits, if it so chooses, within fifteen days of receipt of the affidavits.

The Court has jurisdiction over this case pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., 42 U.S.C. § 1981, and 28 U.S.C. §§ 1331 and 1343.

Plaintiff's motion to amend the pleadings to conform to the evidence in this lawsuit is hereby granted.